UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK SMITH,

      Petitioner,

v.                                         Civil Action Number: 2:11-cv-10031
                                         Honorable Denise Page Hood

HUGH WOLFENBARGER,

      Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS
CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

This is a habeas case filed by a state prisoner pursuant to 28 U.S.C. § 2254.
Michigan prisoner Patrick Smith is currently incarcerated by the Michigan Department of
Corrections at the Macomb Correctional Facility in New Haven, Michigan.  He filed this
*pro se* Habeas Petition challenging his 2008 convictions of four counts of first-degree
murder (supported by two theories of premeditated murder and felony murder), felon in
possession of a firearm, and felony firearm.  Petitioner's convictions occurred following
a jury trial in the Circuit Court in Wayne County, Michigan.  He is serving a life sentence
for each murder conviction, two to five years for the felon-in-possession conviction, to
be served following Michigan's mandatory two-year prison term for the felony-firearm
conviction.  In his Habeas Petition, Petitioner raises claims concerning the effectiveness
of trial counsel, trial court error in instructing the jury, double jeopardy, and cumulative
error.  For the reasons stated, the Court denies the Petition.  The Court also declines to
issue a Certificate of Appealability.

## I. BACKGROUND

Petitioner's troubles in this case arise because of a shooting that took place on October 18, 2007, which resulted in the death of four people, two of whom were children. Trial began on August 11, 2008, and concluded on August 28, 2008. Trial testimony revealed the following pertinent facts.

In October 2007, Ashley Alsup was dating Petitioner. She testified that Petitioner was friends with Jason Davis and lived in the same house with him at 3030 Clairmount Street in Detroit, Michigan. When Petitioner would call her, he typically used Davis's cell phone. Alsup knew Davis as "Smoke or Cuzo" and believed he was Petitioner's cousin. Trial Tr. vol. III, 91 Aug. 13, 2008. Petitioner had taken her to the Clairmount Street house on several occasions. Sometimes, he would drive her in Davis's black Ford Bronco. Alsup knew that the house on Clairmount was a "dope house." *Id.* at 94. She saw Petitioner and Davis conduct drug deals in the house through the kitchen window at the back of the house. Petitioner told her that he sometimes stayed in the house and that Davis was paying him to sell drugs for him. Davis's girlfriend, whom she knew as "Net," and her two children, also stayed at the house. *Id.* at 96-97. Hidden in the floor of the house was an area where an AK-47 was kept for protection. Petitioner and Davis knew the location of the gun. Petitioner also told Alsup that there was a lot of money in the house and that he wanted to take it. She said he had a history of "beefing" with Davis so he was not concerned about the dope man coming after Davis.

On October 17, 2007, Petitioner called Alsup and told her about a planned robbery. He said Davis and his friends were planning to rob the man who supplied the drugs that Davis sold. He said they would probably steal about $4,000 in cash and

$500 worth of drugs.  Alsup was concerned about whether Net and the children would be at the house and Petitioner told her that Davis had sent them away.  Petitioner sent her a text message telling her that the robbery was going to take place within the next two hours.

At about 2:30 a.m., on October 18, 2007, Petitioner contacted Alsup and told her that he was on his way to her house.  Alsup was at a friend's house at a party.  She told him where to find her.  She said he arrived driving Davis's black Bronco.  He told her that the robbery did not go according to plan.  He said he was inside the Clairmount house when he heard gunshots.  He said he came out the back door of the house, ran down the driveway, and started firing the AK-47.  He said he saw two bodies fall and then left.  She said Petitioner told her that Davis directed him to remove everything from the house, put it into the Bronco, and leave.  Petitioner also told her that Davis gave him his cell phone and told him to call his mother in the morning.  After Petitioner told her that, he broke the cell phone in half and threw it in a nearby field.  He said Davis told him to get rid of the phone.

Petitioner then handed the AK-47 to Alsup's friend, Brandon Jordon, and joined the party.  Petitioner asked Jordon whether he wanted to buy the gun for $100 or exchange it for a pistol.  Jordon asked Petitioner where he got the gun and Petitioner said that he "hit a lick," which Jordon understood to mean that Petitioner stole the AK-47.  Petitioner then sat down at a table and took out about sixty or seventy bags of crack cocaine.

Petitioner said he got the drugs from Davis.  Petitioner also showed Alsup a stack of money that he said Davis gave him.  He also showed her two ammunition

3

magazines that were held together with several rubber bands.  Typically, ammunition

magazines are rubber-banded together to allow a shooter to reload the weapon quicker.

Petitioner put the magazines against his own cheek and Alsup's arm and commented

that they were still warm from him shooting the weapon.

Petitioner and a few of Alsup's friends then left the party to go buy snacks at a

store.  Petitioner returned to the party, but then left with Alsup at approximately 3:30

a.m.  He left the AK-47 and the drugs at the party.

Petitioner and Alsup then went to a hotel, the Royal Inn.  Alsup went to sleep, but

was repeatedly awoken by Petitioner exiting and entering the room.

On October 18, 2007, at approximately 3:30 a.m., officers from the Detroit Police

Department responded to 3030 Clairmount Street regarding a shooting.  The call was

made from a nearby pay phone.  When the officers arrived at the scene, they saw that

the windows in the front of the house were broken and there was glass on the front

porch.  It appeared that there were bullet holes in the bottom part of the front window.

The officers had difficulty getting into the house because the front and side doors were

locked and barricaded from the inside with two-by-four planks.  The officers eventually

entered the house after breaking down the locked back door.

After entering the house, the officers saw two mattresses on the floor in the living

room.  A black male and a black female, Jason Davis and Lynnette Lawson, were on

the mattresses and appeared to have been shot.  There were three spent assault

rifle bullet casings on the living room floor approximately twelve to thirteen feet from the

mattresses.  Four more spent casings were discovered on the dining room floor.  In the

back bedroom of the house, the officers found two children, Alexus and Terrence

4

Eppinger, lying face up in bed.  Neither child was responsive.  A blanket covered the

children, and a burn mark was located on the blanket over Terrence, as if a

firearm had been placed "real close to the blanket where the child w[as] sleeping."  Trial

Tr. vol. IV, 78-79 Aug. 14, 2008.  Four assault rifle casings were found on the floor of

the bedroom near the foot of the mattress.

There was no evidence that any shooting occurred outside the house.  Spent

casings were found only inside the house, near all of the bodies.

Dr. Cheryl Lowe, the Wayne County Deputy Chief Medical Examiner, testified

regarding the wounds to the victims.  Jason Davis was shot five times.  Two wounds

were to the right side of the neck. The bullets entered the body from the front, traveled

sharply downward, and exited his back.  The bullets perforated both of his lungs and

severed his spinal cord.  Those wounds were consistent with the shooter aiming the

weapon downward.  He also had a bullet wound in the right side of his chest.  The bullet

causing that wound traveled "front to back, left to right, and downward," which, again,

indicated that his shooter stood higher than the victim.  Trial Tr. vol. III, 35 Aug. 13,

2008.  The three wounds already mentioned had evidence of pseudo-stippling, meaning

that the bullet struck an intermediate target before striking the victim.  Davis also was

shot in the left side of his chest.  That bullet entered the front of the body, damaged the

left lung, and exited his left flank.  The final wound was a graze on his left shoulder.

The damage inflicted on him indicated that the shooter was using a high-velocity

weapon.  His death occurred because of the multiple gunshot wounds.

Lynnette Lawson was shot three times and also died as a result.  Lawson had a

gunshot wound to the right side of her head.  The bullet shattered her skull "like an

eggshell." Trial Tr. vol. III, 42 Aug. 13, 2008.  The bullet then passed through and severed her brain before exiting the left side of her head.  The track of the bullet was right to left and slightly downward.  True stippling was found around the wound indicating that the bullet was fired from close range.  Lawson also suffered a wound to her right arm below the elbow.  True stippling also was present around that wound.  The bullet went through her arm, leaving a large gaping wound.  The exit wound indicated that the bullet was fired by a high-velocity weapon.  That same bullet continued into her right chest, which damaged her right lung and damaged her liver.  The bullet stopped in her abdomen where it was recovered.  Lawson also had a third wound on her left side below her armpit.  The bullet entered the body and traveled sharply upward before exiting her back.

Nine-year-old Alexus Eppinger was shot three times and died as a result.  Alexus was shot in the face, just below the lip.  The majority of the bullet exited Alexus's head, but a portion of the jacket of the bullet remained inside her skull.  The bullet traveled upward in her head breaking several bones in her face and severing her brain.  The bullet broke apart inside her head causing two large gaping exit wounds to the right cheek and right brow.  The type of damage caused by the bullet indicated that it had been fired by a high-velocity weapon.  The wound was consistent with Alexus lying down at the time she was shot.  There also was blood found in her lungs.  Stippling was present around the wound indicating a close-range firing of the weapon.  She also had a graze wound to her left arm.  The bullet then traveled into her chest severing her trachea and esophagus and damaging her spine.  The bullet exited out her back.  She had a third wound, which was a graze wound, to her left elbow.  The bullet entered her

6

body and exited through her back. The damage from the last two wounds also indicated that a high-velocity weapon was used in both instances.

Five-year-old Terrence Eppinger was killed by a single gunshot wound to the abdomen. The bullet entered the front of his body, traveled upward, and exited out the center of his back. The trajectory of the bullet was consistent with Terrence lying down when he was shot, with the shooter standing at his feet. There was no stippling around the wound, but there was stippling present on his arm, shoulder, and face. The location of the stippling indicated that perhaps something was covering his abdomen, such as a blanket, which filtered out the stippling materials. The bullet passed through Terrence's liver, aorta, esophagus, and right bronchial. The bullet fractured the spine before exiting the body. Terrence also had blood in his lungs.

After police processed the scene in the house on Clairmount, that same day Brandon Jordon called them with information about the murders. At that point, there had been news coverage. Jordon told the police about the AK-47 and about Petitioner. He also gave the AK-47 to the police.

At about 2:00 p.m., on October 18, 2007, the police officers went to the Royal Inn Hotel and arrested Petitioner. Petitioner had a duffel bag with him containing Davis's identification.

Examination of the casings recovered from the murder scene revealed that they were all ejected from the AK-47 that Petitioner possessed. The two bullets recovered from the bodies of Lynnette Lawson and Alexus Eppinger were also determined to have been fired from the AK-47.

7

Petitioner testified at trial. He said Davis sold drugs at the Clairmount house for a person named Chris. He claimed he did not sell drugs at the house, but would walk around the neighborhood trying to direct customers to the house. He said Davis asked him to help rob Chris. They had been discussing the robbery for weeks. Petitioner said he believed it was going to happen the night of October 17, 2007. He said he would get the AK-47, ammunition, drugs, and money from the planned robbery. However, he said Davis decided to postpone the robbery because Lynnette Lawson and her children were going to be at the Clairmount house that night. Petitioner said Davis went to sleep with Lawson and the children around 11:00 p.m. on the night in question. He said he left the house to go to the gas station. When he was returning to the Clairmount house, he said he heard gunshots. He said he continued walking to the house.

When he reached the alley behind the Clairmount house, Petitioner said he saw three people run out the back door. He recognized one of the individuals as Chris. Petitioner said he continued into the Clairmount house and smelled what he thought were fireworks. He saw an AK-47 on the floor. He walked into the dining room and saw that Davis and Lawson had been shot. He looked for the house phone in order to call for help, but the phone was gone. He grabbed the AK-47 and left the house. He had Davis's truck keys so he got into the Bronco and drove away. He drove to see Alsup. He denied committing the murders. He did not remember offering to sell the AK-47 because he was drunk and high at the time.

On cross-examination, Petitioner testified that he did not remember speaking to the police after his arrest because he was drunk and high. When asked about specific matters discussed with the police, he testified that he could not remember.

8

To rebut Petitioner's testimony, the prosecutor admitted a copy of a videotaped statement that he made to the police following his arrest.  On the tape, Petitioner never admitted to doing the shooting.  He gave the officer several different versions of what occurred on the night in question.

The jury found Petitioner guilty.  He was sentenced on September 16, 2008, as described.

Following his convictions and sentences, Petitioner filed a Motion for Remand with the Michigan Court of Appeals requesting a *Ginther*[1] hearing.  He claimed that trial counsel was ineffective for failing to object to the prosecutor citing to the videotape of his statement to the police as substantive evidence and for failing to object to the trial court's instructions to the jury that were supported by the videotape evidence, the confession instruction and the aiding and abetting instruction.  On May 8, 2009, the Court of Appeals denied his Motion.  *People v. Smith*, No. 288519 (Mich. Ct. App. May 8, 2009).

Petitioner then filed a Direct Appeal with the Court of Appeals, raising the same claims raised in this Habeas Petition.  The Court of Appeals affirmed his convictions but "remand[ed] for correction of the judgment of sentence."  *People v. Smith*, No. 288519, 2010 WL 746424 (Mich. Ct. App. Mar. 4, 2010).  Petitioner subsequently filed an

---

[1] *People v. Ginther*, 390 Mich. 436, 443, 212 N.W.2d 922, 925 (1973) (holding that a defendant who wishes to raise claims on appeal for which an evidentiary record has not been not adequately preserved should seek an evidentiary hearing in the trial court and, if necessary, file a Motion for Remand in the Court of Appeals to hold such hearing).

Application for Leave to Appeal the Court of Appeals's decision with the Michigan

Supreme Court, raising the same claims.  On June 28, 2010, the Supreme Court

denied the Application.  *People v. Smith*, 486 Mich. 1048, 783 N.W.2d 365 (2010)

(Table).

Petitioner neither filed a Motion for Relief from Judgment with the state trial court

nor a Petition for a Writ of Certiorari with the Untied States Supreme Court.  Rather, he

filed this Habeas Petition on January 4, 2011, signed and dated December 28, 2010.

## II.  STANDARD OF REVIEW

Petitioner's claims are reviewed against the standards established by the

Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat.

1214 (AEDPA), which provide:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' [the United States Supreme Court's]

clearly established law if it 'applies a rule that contradicts the governing law set forth in

[Supreme Court cases]' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20 (2000)). "[T]he 'unreasonable application' prong of [the statute] permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35 (2003) (quoting *Williams*, 529 U.S. at 413, 120 S.Ct. at 1495). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21, 123 S.Ct. at 2535 (citations omitted).

Recently, in *Harrington v. Richter*, --- U.S. ---, 131 S.Ct. 770, 786-87 (2011), the United States Supreme Court held:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. ----, ----, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

> * * *

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332 n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)

(Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

With those standards in mind, the Court proceeds to address Petitioner's claims.

### III.  DISCUSSION

### A.  Claim I

In his first habeas claim, Petitioner argues that habeas relief is warranted because he received ineffective assistance of trial counsel when counsel failed to object to the unsupported aiding and abetting instruction.  Respondent argues that the claim lacks merit.

Petitioner was charged with four counts of first-degree murder.  The charges were based on two alternative theories, premeditated murder and felony murder.  With respect to premeditated murder, the prosecutor argued in closing argument:

> My position and I'll get back to it later, four individuals who are clearly, clearly, ambushed while they are sleeping, done purposely, it was an execution, and there ain't no other way to describe what happened to four people based on the testimony in this case.

> Testimony indicated Miss Lawson, Mr. Davis are executed and shot.  Him five times her three times in the head with a high-powered assault rifle, and then the two children, which is down the hallway which someone who knows that house, down the hallway here are two children. Coincidentally, two children that didn't get along with Patrick Smith, according to the testimony.  Two children that know him, that know him by face.  And they were taken out as just insurance.

> Somebody, Patrick Smith, walked down the end of the hallway and popped two children for the heck of it, to keep him from being identified. And this whole case has been nothing but wreaking of an individual trying not to be identified.

Trial Tr. vol. XI, 35-36 Aug. 27, 2008.

With regard to felony murder, the prosecutor argued:

> The next charge, ladies and gentlemen, there are four separate counts of felony murder. The long and short of what Judge Thomas is going to instruct you on, she's gonna say it is a murder two, that lesser charge, during the commission or attempt perpetration of a felony. So during the perpetration or attempt perpetration of a felony. And that is charged the larceny. See, the money, the drugs, Jason Davis, unless he asked a corpse for permission to use that car, that's how it was taken. The drugs were taken, the money was taken and that leads us into the testimony from our civilians.

Trial Tr. vol. XI, 38 Aug. 27, 2008.

The prosecutor also made an argument during closing that Petitioner could be found guilty of murder under an aiding and abetting theory. That theory was based on Petitioner's statement that he had given the police. The prosecutor stated:

> And if you notice from the tape Mr. Smith sat back and went, guess what, another lie. And you're caught dead in it. Dead in it. 'Cause now you know they all ratted you out.
>
> And then it changes, which brings us to what we're talking about as to the alternate theory of aiding and abetting. He now indicates that he, along with other persons, are intending to rob the persons at the location. He says quote, I didn't do it but I was there. I was there. I couldn't stop it. It was a robbery taking place. It wasn't my idea. I was supposed to be gone before the shooting. He knew there was going to be shooting beforehand. Is that a lie or the truth? He's the one who locked the back door. He's the one who was there at the scene. He's the one who let the person in. If, in fact, you don't believe him to be the shooter, which I don't think you do, you have him aiding and abetting others in a robbery of that location. That's what that statement, the significance of that statement.

Trial Tr. vol. XI, 46-47 Aug. 27, 2008.

The trial court instructed the jury on aiding and abetting. Trial Tr. vol. XII, 22-23 Aug. 28, 2008. Petitioner argues that counsel was ineffective for failing to object to the instruction.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court established a two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel.  First, a petitioner must prove that counsel's performance was deficient.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [] by the Sixth Amendment."  *Id.* at 687, 104 S.Ct. at 2064.  Second, a petitioner must show that counsel's deficient performance prejudiced the petitioner.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694, 104 S.Ct. at 2068.  A court's review of counsel's performance must be "highly deferential."  *Id.* at 689, 104 S.Ct. at 2065.

The Supreme Court has confirmed that a federal court's consideration of ineffective-assistance-of-counsel claims arising from state-criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.  "The standards created by *Strickland* and [section] 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, --- U.S. at ---, 131 S.Ct. at 788 (internal and end citations omitted).  "When [section] 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.  *Id.* at ---, 131 S.Ct. at 788.

The Michigan Court of Appeals in addressing, and denying, this claim, stated:

14

At trial, the prosecutor introduced the video recording of
defendant's statements to the police in rebuttal after defendant testified.
Although the prosecutor, in his cross-examination of defendant, stated that
he would introduce defendant's statements as impeachment evidence,
there is no indication in the record that the trial court limited the
admissibility of defendant's statements for impeachment purposes.  In
addition, defendant has not provided us with any argument supported by
the record that his statements were not admissible as substantive
evidence.  Defendant's statements, as statements of a party-opponent,
were admissible as both impeachment and substantive evidence under
MRE 801(d)(2).  [].  Furthermore, the video recording was proper rebuttal
evidence.  [].  Because the facts on the record do not establish that
defendant's statements were admissible only for the limited purpose of
impeachment, any objections by defense counsel to the jury instructions
or the prosecutor's closing argument based on a claim that defendant's
statements could not be used as substantive evidence would have lacked
merit.  Counsel was not ineffective for failing to make futile objections.  [].
Defendant was not denied the effective assistance of counsel.

*Smith*, 2010 WL 746424, at *1 (citations and footnote omitted).

Petitioner argues that the only evidence that he aided and abetted the murders

was contained in his statement to the police.  The statement, he contends, could not be

used to support an aiding and abetting theory because it was admitted only as

impeachment evidence and not substantive evidence.  The record does not support

Petitioner's contention.  Although the prosecutor moved to introduce his statement for

impeachment purposes, there is no indication that the trial judge limited its admissibility.

The prosecutor could use the statement as substantive evidence and it could support an

aiding and abetting theory.

Under Michigan's Rule of Evidence 801(d)(2), the statements were admissible as

statements of a party opponent.  The Court of Appeals determined such and federal

habeas courts "'must defer to a state court's interpretation of its own rules of evidence

and procedure' when assessing a habeas petition."  *Miskel v. Karnes*, 397 F.3d 446,

453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)).

Additionally, Petitioner cannot show that he was prejudiced by counsel's alleged deficiency given the overwhelming evidence against him. Petitioner stayed in the house where the victims were murdered. He knew that an AK-47 was hidden in the house. He told Alsup that there was a lot of money in the house and that he wanted to take it. On the day in question, he called her and told her that he was going to rob the house. He sent her a text telling her about the robbery. After the murders, he appeared at a party with the murder weapon, cocaine, and money, which he told others he got from one of the murdered victims. He put ammunition magazines on Alsup's arm and said that they were still warm from him shooting the weapon. When he was arrested, he had Davis's wallet with him.

With that, the Court concludes that the Michigan Court of Appeals's determination, that Petitioner was not denied the effective assistance of trial counsel because of counsel's failure to object to the admission of his statement to the police, was not contrary to, or an unreasonable application of, clearly established federal law. He is not entitled to habeas relief with respect to this claim.

Petitioner also alleges that the statement was inadmissible for substantive purposes because it was taken in violation of his *Miranda*[2] rights. Respondent argues that this part of Petitioner's ineffective-assistance-of-counsel claim is procedurally defaulted.

The last state court to address this claim was the Michigan Court of Appeals on

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

16

direct review.  The Court of Appeals denied that part of his claim, stating:

> To the extent that defendant suggests his statements were taken in violation of *Miranda*, the record below shows that the trial court never excluded defendant's statements to the police for this reason.  Also, there is no indication that defendant raised any questions as to the voluntariness of the statements and no *Walker*[] hearing was ever held.  Moreover, on appeal, defendant has not addressed the merits of the alleged *Miranda* violation.  Under these circumstances, we find the claim abandoned.  [].

*Smith*, 2010 WL 746424, at *1 (citation and footnote omitted).

The Court of Appeals declined to address this part of the claim because it was not sufficiently briefed to properly invoke appellate review.  Petitioner failed to comply with state procedural rules concerning preservation and presentation of claims in the Court of Appeals.  *See Lee v. Booker*, No. 2:08-cv-11170, 2010 WL 5068025, at *8 (E.D. Mich. Dec. 7, 2010) (Edmunds, J.) (citing *Santiago v. Booker*, No. 07-cv-15455, 2010 WL 2105139 (E.D. Mich. May 25, 2010) (Rosen, J.); *Belanger v. Stovall*, No. 07-cv-11336, 2009 WL 2390539 (E.D. Mich. July 31, 2009) (Cleland, J.)); *see also Marchbanks v. Jones*, No. 1:06-cv-269, 2009 WL 1874191 (W.D. Mich. June 26, 2009) (Quist, J.) ("a review of Michigan cases shows that the principal of abandonment is regularly applied and is a ground independent of the merits").

Therefore, this claim is procedurally defaulted.  Petitioner does not attempt to demonstrate cause or actual innocence to excuse the default.  Accordingly, this part of Petitioner's ineffective-assistance-of-counsel claim is barred from habeas review.

**B.  Claim II**

17

In his second habeas claim, Petitioner contends that the trial court, while accurately instructing the jury on the intent element of second-degree murder, failed to separately define the term "great bodily harm." The trial court instructed the jury as follows:

> You may also consider the lesser charge of second[-]degree murder. To prove this charge the prosecutor must prove the following elements beyond a reasonable doubt.
>
> First, that defendant caused the death of Jason Davis, Lynette Lawson, Terrance Eppinger, Alexus Eppinger. That is, that Jason Davis, Lynette Lawson, Terrance Eppinger, Alexus Eppinger died as a result of gunshot wounds.
>
> Second, that the defendant had one of these three states-of-mind. He intended to kill or intended to do great bodily harm to Jason Davis, Lynette Lawson, Terrance Eppinger, Alexus Eppinger. Or he knowingly created a very high risk of death or great bodily harm, knowing that such death or such harm would be the likely results of his actions.

Trial Tr. vol. XII, 20-21 Aug. 28, 2008.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Rather, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 1737 (1977); *see also Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 484 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet that burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The Michigan Court of Appeals addressed the issue as a matter of state law:

18

The trial court instructed the jury on all the elements of second-degree murder.  [].  It did not, however, define the term "great bodily harm."  The term is not defined by statute, and there is no error when a trial court fails to define a term that "is generally familiar to lay persons and is susceptible to ordinary comprehension."  [].  Case law has defined "great bodily harm" as a "serious injury of an aggravated nature."  [].  Defendant makes no persuasive argument that a lay person's "ordinary comprehension" of the term "great bodily harm" does not comport with the case law definition.  Accordingly, defendant has not shown that the trial court plainly erred when it failed to define the term "great bodily harm."

Moreover, even if the trial court did err in failing to define the term, the error did not affect defendant's substantial rights.  The jury found defendant guilty of first-degree premeditated murder.  Thus, the jury obviously concluded that defendant acted with an actual intent to kill.  [].

*Smith*, 2010 WL 746424, at *2 (citations omitted).

As the Court of Appeals held, Petitioner failed to demonstrate that the jury instruction was erroneous under state law.  Because the instruction was correct under state law, Petitioner cannot show that it had any prejudicial effect, much less that it "so infused the trial with unfairness as to deny due process of law."  *Estelle*, 502 U.S. at 75, 112 S.Ct. at 484.  Petitioner therefore cannot meet his burden of showing fundamental unfairness in violation of due process.  He is not entitled to habeas relief with respect to this claim.

### C.  Claim III

In his third habeas claim, Petitioner argues that his conviction for first-degree premeditated murder and first-degree felony murder for each victim violated double jeopardy.  Petitioner presented this claim to the Court of Appeals.  The Court of Appeals agreed and remanded the case to the trial court for modification of his

sentence to specify what he was convicted of and how it was supported by the two

19

theories of premeditated murder and felony murder. *Smith*, 2010 WL 746424, at *1, *3.

Because the Court of Appeals corrected this error, Petitioner's third habeas claim is moot and does not entitle him to any habeas relief.

### D. Claim IV

In his fourth and final habeas claim, Petitioner alleges that the cumulative effect of the errors denied him a fair trial. The Court of Appeals addressed and rejected this claim, stating: "Based on our foregoing conclusions regarding the alleged errors, there is no basis to reverse on a 'cumulative effect' argument. []." *Smith*, 2010 WL 746424, at *2 (citation omitted).

"The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Constitutional errors that would not individually support habeas relief simply cannot be cumulated to support habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (citing *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002), and *Lorraine*, 291 F.3d at 447)). Petitioner is not entitled to habeas relief based on a cumulative-error claim.

### E. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a [COA] when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have

20

been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604 (2000) (citation omitted).

In this case, the Court concludes that reasonable jurists would not debate its conclusion. The Court will decline to issue Petitioner a COA.

## IV.  CONCLUSION

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, it is ORDERED that the Petition for a Writ of Habeas Corpus [Dkt. # 1] is DENIED.

IT IS FURTHER ORDERED that the Court DECLINES to issue Petitioner a Certificate of Appealability.

IT IS SO ORDERED.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  May 31, 2012

I hereby certify that a copy of the foregoing document was served upon Patrick Smith #255726, 34625 26 Mile Road, New Haven, MI 48048 and counsel of record on May 31, 2012, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager